UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT J. BOSTON,

                           Plaintiff,

        -against-

MACFADDEN PUBLISHING, INC.,

                    Defendant.

09 Civ. 457 (RJH)

**MEMORANDUM OPINION
AND ORDER**

Richard J. Holwell, District Judge:

      Plaintiff Robert J. Boston ("Boston") filed this action against defendant Macfadden

Publishing, Inc. ("Macfadden"), alleging that Macfadden terminated his employment in violation

of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*  Defendant

brought a motion for summary judgment on all counts pursuant to Fed. R. Civ. P. 56.  For the

reasons set forth below, defendant's motion is granted in its entirety.

## BACKGROUND

      Taken in the light most favorable to plaintiff, the party against whom summary judgment

is sought, the record, which includes depositions, declarations, and documentary exhibits, shows

the following.

      Plaintiff was formerly employed at Macfadden as Senior Vice President, Circulation and

Production.  (Def. 56.1 Stmt. ¶ 12; Callahan Decl. ¶ 4.)  Plaintiff began his employment as a

production manager with Macfadden in 1991 at the age of 55, with a starting salary of $50,000.

(Def. 56.1 Stmt. ¶¶ 2, 5; Pl. Dep. at 33:20–22.)  He was hired by Peter J. Callahan ("Callahan"),

the owner and chairman of Macfadden, after having had almost 32 years of experience in the

publishing industry.  (Def. 56.1 Stmt. ¶¶ 3, 4.)  During his tenure at Macfadden, Boston gained several promotions and raises.  By 1996, Boston was reporting directly to Jeffrey Schaeffer ("Schaeffer"), Macfadden's CEO.  (*Id.* ¶ 13.)  By 2002, Boston's salary had risen to $100,000. (*Id.* ¶ 15.)

In January 2005, Schaeffer prepared an annual performance assessment for Boston that was generally positive, but also noted points for improvement.  The assessment praised Boston as "a true asset to our company" and noted that "we need to draw as much from his experience and knowledge as possible."  (Schaeffer Decl. Ex. C.)   It identified his major strengths as "his considerable knowledge and experience in magazine production and controlled circulation," and his effectiveness "as a negotiator," which helped in "saving us money in various areas of circulation and manufacturing."  (*Id.*)

At the same time, the assessment contained criticisms of aspects of Boston's management style, falling into three general categories.  First, Schaeffer criticized Boston's interpersonal skills, emphasizing the need for Boston to work more collaboratively and to be less confrontational with co-workers.  (*Id.*)  The assessment commented that Boston "tends to be defensive and protective when there is criticism, and obstructive in terms of letting managers work things out with individuals within his department without his direct involvement."  (*Id.*)  It also noted that Boston's management approach was "at times" to "intimidate" others rather than allowing them to work out solutions on their own.  (*Id.*)  Schaeffer suggested that Boston "needs to concern himself less with control and more with the ultimate outcome."  (*Id.*)

Second, Schaeffer criticized Boston's understanding of his role in the process of magazine design.  (*Id.*)  In particular, the assessment suggested that Boston needed to employ a better understanding of his role with respect to the art department, noting that "[h]e makes

judgments about art staff performance based largely on productivity, . . . and at times does not give adequate consideration to the nature of the project at hand." (*Id.*) It also advised that Boston "needs to work more closely, *collaboratively*" with art staff and "be less confrontational with art staff that he doesn't believe are working fast or hard enough, this including the Chicago based [art director]." (*Id.*) (emphasis in original)

Third, Schaeffer observed that circulation goals for Dance Magazine, one of Macfadden's publications, had not been met, and although "it could be argued that [Dance Magazine] has run smaller issues in the past few years, making it less attractive to subscribers and single copy prospects, we still need fresh, effective approaches to building this revenue." (*Id.*) Schaeffer suggested that Boston could enhance his performance generally by "participating in publishing workshops conducted by . . . circulation associations to broaden his view." (*Id.*)

Boston reacted to receipt of Schaeffer's evaluation in an e-mail on January 18, 2005, with a measure of self-defense. (Schaeffer Decl. Ex. D.) Regarding the assessment's criticisms of his interpersonal skills, Boston protested that he had "never intentionally tried to intimidate anyone in the company. If one felt intimidated, that's something that I can't help." (*Id.*) Boston responded to the charge that he was too concerned with control by asserting that he involved himself in problems of "a serious nature" only. (*Id.*) Regarding Schaeffer's criticisms of his interactions with the art department, Boston emphasized that his responsibility as a manager was to meet deadlines, not run the art department. He also characterized the Chicago art director's telecommuting arrangement as "one of the most ill-conceived arrangements I have seen in my many years in publishing." (*Id.*) In the e-mail, he blamed the failure to reach the circulation goals of Dance Magazine on the publishers of the magazine, noting that because "editorial drives circulation," the magazine's "editorial content must be weak, as well as our cover designs." (*Id.*)

3

Boston found the suggestion that he participate in circulation association workshops to be "insulting."  He insisted that all negative assessments be expunged for fear that if a new CEO were to arrive at the company, "the only thing that person would have to go on, regarding me, is your evaluation." (*Id.*)  If the dialogue between he and Schaeffer regarding his performance were to continue, Boston warned, it could "destroy our professional and personal relationship." (*Id.*)  Schaeffer revised Boston's performance assessment to tone down the criticism in response to Boston's concerns that it would create difficulties if he had a boss other than Schaeffer.  (Def. 56.1 Stmt. ¶ 28.)  Schaeffer also agreed that such negative comments would be discussed face-to-face, not in writing.  (Schaeffer Decl. Ex. D.)

In Boston's 2005 performance review, prepared in January 2006, Schaeffer was generally positive and avoided negative subjects that had created difficulties with Boston the previous year.  (Def. 56.1 Stmt. ¶¶ 39, 40.)  Nevertheless, Boston was advised to be "less strident" and to adopt a "more positive attitude" in certain areas.  (*Id.* ¶ 40.)  In December 2005, Boston received a bonus of $10,000 and a salary increase of $10,000.  (Def. 56.1 Stmt. ¶ 42.)  The salary increase was the first Boston had received in three years.  (Callahan Decl. ¶ 8.)

On January 3, 2006, Boston told Schaeffer that Callahan wanted him to participate in a January 4 meeting between Schaeffer and Circulation Specialists, Inc. ("CSI"), but Callahan had not actually said anything to that effect.  (Def. 56.1 Stmt. ¶¶ 31, 32.)  Callahan and Schaeffer were angered and considered this an act of insubordination; Schaeffer wrote a memo to Callahan voicing his concerns about Boston's "latest shenanigan" on January 11, 2006, calling Boston's conduct "intolerable, completely unacceptable."  (Schaeffer Decl. Ex. G.)  Schaeffer also wrote an e-mail to Boston to voice his dissatisfaction about the January 3 incident, calling it "misleading and a breach of trust."  (Def. 56.1 Stmt. ¶¶ 36; Schaeffer Decl. Ex. H.)

Callahan told Anna Blanco ("Blanco"), a Macfadden employee, that Boston's shortcomings and the January 3 incident should be documented, and Blanco relayed this message to Schaeffer in a January 11, 2006 e-mail. (*See* Callahan Decl. ¶ 8; Schaeffer Decl. ¶ 24.) On the same day, Schaeffer and Callahan discussed an organizational change that would elevate Blanco to Senior Vice President and Treasurer and Gerard Cerza ("Cerza") to Senior Vice President and Chief Financial Officer. (Def 56.1 Stmt. ¶ 34.) Under the planned change, Boston would no longer report directly to Schaeffer, but would instead report to Cerza. (*Id.*) Schaeffer and Callahan considered this an effective demotion for Boston. (*Id.*) On January 20, 2006, Schaeffer formally announced that these organizational changes would be made. (*Id.* ¶ 43.)

During the last several years of Boston's employment leading up to his termination in 2008, the issue of Boston's retirement came up on multiple occasions. (Boston Decl. ¶ 2.) Boston would on occasion raise the notion that he would retire with Schaeffer, and at a lunch meeting likely held in January 2006, Schaeffer asked Boston about what his plans were. (Def. 56. 1 Stmt. ¶ 37; Schaeffer Dep. at 47:7–48:12.) Boston responded that he might retire in a year or two, but that he was still unsure. (Schaeffer Dep. at 47:16–17.)

In July 2007, Boston and Callahan had a contretemps over who the company would hire to undertake subscription campaigns. Callahan directed Boston to give subscription work on two publications, *Pet Business* and *Pizza Today*, and to try to give telemarketing work on another publication, *Home Furnishing News*, to Hunter Marketing, a company owned by James Murray ("Murray"). (Def. 56.1 Stmt. ¶ 45.) Boston, however, delayed providing information to Murray, and according to Murray, because the information was received too late to be able to complete the work on time, he had to decline the work. (*Id.* ¶ 46, 47.) Murray submitted an invoice for the work he had done, but Boston advised Murray that he was not going to pay the invoice.

(Callahan Decl. Ex. B.)  Murray sent a fax to Callahan complaining about the situation on November 2, 2007, and Callahan regarded the incident as another act of insubordination by Boston.  (Callahan Decl. ¶ 10.)

In March 2007, Macfadden hired Dennis Respol ("Respol") on Boston's recommendation as a production manager because Macfadden had recently started weekly publication of *Home Furnishing News*.  (Def. 56.1 Stmt. ¶ 49; Schaeffer Decl. ¶ 31; Pl. Dep. at 86:11–17.)  At the time of hiring, Respol was 61 years old and earned an initial salary of $85,000 per year.  (Def. 56.1 Stmt. ¶¶ 49, 50.)  The need to hire Respol arose because the magazine's production schedule was more rigorous than Macfadden's other publications, which ran on monthly schedules.  (Def. 56.1 Stmt. ¶ 52; Schaeffer Decl. ¶ 32.)  Respol previously had experience in production management positions at Sterling Macfadden, a company previously owned by Callahan that shared office space with Macfadden.  (Def. 56.1 Stmt. ¶ 50.)  Respol's responsibilities at Macfadden were similar to Boston's, and when the publication of *Home Furnishing News* switched to a less frequent schedule in late 2007, Callahan and Schaeffer were faced with extra capacity in Macfadden's production manufacturing.[1]  (Def. 56.1 Stmt. ¶ 53.)

Callahan made the decision to eliminate Boston's position in late December 2007, and instructed Schaeffer to inform Boston of the decision after the New Year holiday, but not to discuss Callahan's reasons for eliminating the position.  (Callahan Decl. ¶¶ 17, 18.)  On January 3, 2008, Schaeffer, Cerza, and Blanco met Boston in a Macfadden conference room and told him

---

[1] Both the Callahan and Schaeffer Declarations make reference to the reduced frequency of the magazine's publication schedule, but erroneously say that it was "reduced" or "scale[d] back" to semi-weekly from weekly.  (Callahan Decl. ¶ 12; Schaeffer Decl. ¶ 33.)  The Court assumes that the declarations meant to refer to publication every two weeks, rather than "semi-weekly" publication, which would be publication twice per week.  *Webster's Third New International Dictionary* 2065 (2002) (defining "semiweekly" as "occurring, appearing, or being made, done, or acted upon twice a week").

that Callahan had decided to terminate his employment and that the decision was final.  (Def. 56.1 Stmt. ¶ 60.)  Boston testified at his deposition that he was not told of the reason for his termination.  (Pl. Dep. at 41:12–17.)  In his Charge of Discrimination filed with the New York State Division of Human Rights ("NYSDHR"), however, Boston affirmed that he was told that the reason for his termination was that his position was being eliminated.[2]  (Roberts Decl. Ex. H.)  When Boston later asked Callahan for a reason for his termination, Callahan told Boston that he had "retired," although both Callahan and Boston clearly knew that he had been fired.  (*See* Pl. Dep. at 41:25–42:5; Callahan Decl. ¶ 17.)  The record appears to show that other employees had been told that Boston had retired, not that he had been fired.  (*See* Byrne Blair Decl. Ex. D.)

The primary reason Macfadden offers for Boston's termination is that "necessary cost cutting could be accomplished by elimination Mr. Boston's position," since "Macfadden had extra capacity and costs in its production manufacturing" after Respol's hire and the scaling back of *Home Furnishing News*'s publication schedule.  (Callahan Decl. ¶¶ 12, 13.)  In Callahan's view, because "Boston was not a 'hands on' manager," eliminating Boston's position also "save[d] money by eliminating a layer of management."  (*Id.* ¶ 14.)  In addition, Callahan also considered "Boston's unresponsiveness to direction from [Callahan] and other Macfadden executives," his having "acted insubordinately," and "unsatisfactory performance" in certain areas.  (*Id.* ¶ 13.)  Boston asserts that the real reason for his termination was age discrimination because "nobody could give [him] an answer" as to why his position had been eliminated.  (Pl. Dep. at 41:12–14.)  Respol assumed Boston's production manufacturing duties, which had occupied at least 80% of Boston's time at Macfadden.  (Def. 56.1 Stmt. ¶¶ 61, 62.)  James

---

[2] In his NYSDHR complaint, Boston also stated that he had "never received any criticism" nor had been "told of any dissatisfaction with [his] services."  (Roberts Decl. Ex. H.)  The record does not support his assertion.  (*See* Schaeffer Decl. Ex. D.)

Sardone ("Sardone") took up Boston's circulation duties, and received a salary increase of about $5,000.  (*Id.* ¶ 63.)  At the time of Boston's termination, Boston was 71, Callahan and Schaeffer were 66, Respol was 63, and Sardone was 43.  (*Id.* ¶¶ 63, 64.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper if the moving party shows that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In deciding whether there is a genuine issue of material fact as to an element essential to a party's case, the court must examine the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party."  *Abramson v. Pataki*, 278 F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The moving party must demonstrate that no genuine issue exists as to any material fact.  *Celotex*, 477 U.S. at 323–25.  As to an issue on which the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 325 (rejecting a construction of Rule 56(c) that would require the party moving for summary judgment to produce evidence affirmatively establishing the absence of a genuine issue of material fact with respect to an issue on which the nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial."  *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  In

seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial. *See Anderson*, 477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002). Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial. *See H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454–55 (2d Cir. 1991) (stating that "hearsay testimony that would not be admissible if testified to at the trial may not properly be set forth in [a Rule 56] affidavit") (internal quotation marks and citation omitted).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case," especially "where . . . the merits turn on a dispute as to the employer's intent." *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008). "Even in the discrimination context, however, a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." *Id.* Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

II.     *Boston's Age Discrimination Claims*

A.     *The Framework for Analyzing Age Discrimination Claims*

The purpose of the ADEA is to "promote employment of older persons based on their ability rather than age" and "to prohibit arbitrary age discrimination in employment." 29 U.S.C. § 621(b). In part, the ADEA prohibits an employer from "dischar[ging] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms,

conditions, or privileges of employment, because of such individual's age."  29 U.S.C. §

623(a)(1).[3]

The burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411

U.S. 792, 802 (1973), sets forth the order and allocution of proof in evaluating ADEA claims.[4]

*See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106–10 (2d Cir. 2010) (using the

*McDonnell Douglas* framework in an ADEA case); *see also D'Cunha v. Genovese/Eckerd*

*Corporation*, 479 F.3d 193, 194–96 (2d Cir. 2007); *Tomassi v. Insignia Financial Group, Inc.*,

478 F.3d 111, 114 (2d Cir. 2007).  Under this framework, a plaintiff asserting age discrimination

must first establish a prima facie showing "(1) that she was within the protected age group, (2)

that she was qualified for the position, (3) that she experienced adverse employment action, and

(4) that such action occurred under circumstances giving rise to an inference of discrimination."

*Gorzynski*, 596 F.3d at 107.  Once the plaintiff has presented a *prima facie* case, a presumption

of discriminatory animus arises, and the burden shifts to the defendant to proffer a legitimate,

nondiscriminatory business rationale justifying its adverse employment action.  *Id.* at 106;

*D'Cunha*, 479 F.3d at 195.  Defendant's burden is "one of production, not persuasion."  *Reeves*

*v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000); *D'Cunha*, 479 F.3d at 195–96.

Assuming the defendant is able to meet that burden, the plaintiff's burden at the third step is to

"raise[] sufficient evidence upon which a reasonable jury could conclude by a preponderance of

---

[3] Plaintiff, in his complaint, claims only violations of 29 U.S.C. § 623(d), the ADEA's anti-
retaliation provision (Compl. ¶ 7), but the Court assumes he intended to claim violations of 29
U.S.C. § 623(a), as the record is devoid of any evidence or accusation indicating retaliation on
the defendant's part.

[4] Plaintiff acknowledges that "the Second Circuit has applied McDonnell Douglas consistently to
ADEA claims and continues to do so," but "respectfully request[s] that the Court be mindful that
this framework may not be the end all in determining whether or not a plaintiff in an age
discrimination lawsuit meets his burden of establishing age discrimination."  (Pl.'s Opp. 8.)  The
Court is unsure of what is meant by this quizzical statement, but nevertheless declines any
invitation to abandon established Second Circuit and Supreme Court precedent.

the evidence that her age was a 'but for' cause of [defendant's] decision to fire her." *Gorzynski*, 596 F.3d at 107.[5]

B. *Boston's Prima Facie Showing*

In order to establish a prima facie case of age discrimination, Boston must show (1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination. *Gorzynski*, 596 F.3d at 107.  The Second Circuit has described the burden of establishing a prima facie case as "not a heavy one," *id.* at 107, and "de minimis." *Tomassi*, 478 F.3d at 114.  Here, it is undisputed that Boston satisfies the first and third prongs of the test.  (Def.'s Mem. 16.)

Defendant contends that Boston fails the second prong of the test because his 2004 performance assessment indicated that he needed to increase the effectiveness of his interpersonal skills and management style; his 2005 performance assessment continued to note issues with Boston's interpersonal skills and general attitude; he had drawn the ire of

---

[5] The Supreme Court recently clarified the standard for prevailing on an ADEA claim in *Gross v. FBL Financial Services, Inc.*, 557 U.S. ____, 129 S. Ct. 2343 (2009).  Prior to *Gross*, the *McDonnell Douglas* framework characterized the third step on a defendant's motion for summary judgment as a question on "whether the evidence in plaintiff's favor, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that her dismissal was motivated at least in part by age discrimination." *Tomassi*, 478 F.3d at 114. *Gross* modified the plaintiff's burden in an ADEA case by holding that "[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Gross*, 129 S. Ct. at 2351.  Therefore, the "mixed-motive analysis" previously applied by the circuit courts has been eliminated. *Gorzynski*, 596 F.3d at 106.  The Second Circuit has confirmed, however, that the basic burden-shifting framework of *McDonnell Douglas* remains intact despite *Gross*'s modification of the plaintiff's ADEA burden. *Gorzynski*, 596 F.3d at 106 ("[W]e remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit."). *Gross*, under this framework, modifies the third step of the *McDonnell Douglas* analysis to use the "but-for" language instead of the "motivated at least in part" language previously employed. *Id.* at 106–07.

management when he misrepresented himself to Schaeffer concerning instructions given by

Callahan; and he had defied a directive from Callahan to use Murray for telemarketing projects.[6]

(Def. Mem. at 17–18.)  Plaintiff counters that his lengthy experience in the publishing industry

and at Macfadden indicate that he was qualified for the job.  (Pl. Opp. at 10.)

To establish that he was qualified for the position, Boston need only make a showing that

he "possesse[d] the basic skills necessary for performance of the job."  *Owens v. New York City*

*Housing Authority*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks and citations

omitted).  The plaintiff "need not show perfect performance or even average performance."

*Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001).  Yet whether an employee is "qualified" still

"depends on the employer's criteria for the performance of the job—not the standards that may

seem reasonable to the jury or judge."  *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d Cir.

1997).  In cases "where discharge is at issue and the employer has already hired the employee,

the inference of minimal qualification is not difficult to draw."  *Slattery v. Swiss Reinsurance*

*America Corp.*, 248 F.3d 87, 92 (citing *Gregory*, 243 F.3d at 695–96).

Where misconduct is involved, "whether misconduct precludes a finding that a plaintiff is

qualified for his position depends both on the *kind* of misconduct, i.e. whether it speaks to the

plaintiff's competence and job skills, and the *seriousness* of the misconduct, i.e. whether 'in the

---

[6] Defendant also argues that Boston was "not qualified for the newly created position of
Production Manager."  (Def. Mem. at 19.)  This argument, however, is directed to the wrong
point.  Boston's claim is that he was discharged from his position due to discrimination, not that
there was a failure to hire or a failure to promote him due to discrimination. In such situations,
the appropriate inquiry is whether Boston was qualified for the position from which he was
discharged, not the newly created position.  *See Chow v. Stride Rite Corp.*, No. 05 Civ 02417
(PGG), 2009 WL 196030, at *4 (S.D.N.Y. Jan. 27, 2009) (finding that where plaintiff made a
discriminatory termination claim, the appropriate inquiry was into qualification for the
eliminated position, not the newly created position); *Donaldson v. Merrill Lynch & Co.*, 794 F.
Supp. 498, 504 (S.D.N.Y. 1992) ("Whether [plaintiff] was qualified for the 'new' position is
neither the relevant nor the proper inquiry at this stage . . . .  [T]he appropriate inquiry is whether
she was qualified for the position from which she was discharged.").

aggregate' plaintiff still performed his job satisfactorily." *Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).  Because "an employee's alleged or admitted misconduct is often inextricably intertwined with the employer's legitimate, non-discriminatory reason for the employee's termination," however, it may be "inappropriate" in such cases "to evaluate the employee's misconduct in the context of the *prima facie* case."  *Id*. at 492–93; *see also Calabro v. Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 289 (S.D.N.Y. 2005) ("[I]f an otherwise qualified employee is alleged to have engaged in misconduct or otherwise to have created circumstances justifying her termination, that conduct is appropriately evaluated, not in the *prima facie* 'qualifications' analysis, but rather in assessing the employer's stated neutral reason . . . and the employee's pretext case.").  This is because "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision."  *Slattery*, 248 F.3d at 92; *see also Ruiz*, 609 F.3d at 493 ("Of course, . . . even if evidence of employee misconduct is not relevant to plaintiff's *prima facie* case, it may still be used by an employer to show that it had a legitimate, non-discriminatory reason for plaintiff's termination.").  Boston's misconduct, therefore, is best addressed at the third step of the analysis, not in the prima facie case.

Here, plaintiff has met his burden for the second prong of the prima facie case.  Boston had over 16 years of experience at Macfadden, and had been promoted multiple times while in defendant's employ.  *See Gregory*, 243 F.3d at 697 (holding that being employed by the defendant for ten years with multiple promotions and arguing that the defendant's proffered explanations were pretextual "suffice[d] to plead [plaintiff's] qualification for the position"); *Augustin v. Yale Club of New York City*, No. 03-CV-1924 (KMK), 2006 WL 2690289, at *23

(S.D.N.Y. Sep. 15, 2006) ("Due to the fact that Defendant hired, promoted, and retained Plaintiff for a significant period of time, Plaintiff has sufficiently pled the second prong of her prima facie disparate treatment claim, that she was qualified for the position.").  The performance reports that defendant references fail to support the claim that Boston did not possess the requisite basic skills for his job.  Although the 2004 performance assessment contained a number of criticisms of Boston, it also noted that he was "a true asset to our company."  (Schaeffer Decl. Ex. C.)  The 2005 performance assessment, despite its identification of similar problems in Boston's performance as the 2004 assessment, was "generally positive."  (Def. 56.1 Stmt. ¶ 40.)  Although the assessments may show some deficiencies in Boston's performance that ultimately contributed to his termination, neither assessment goes so far as to indicate that Boston lacked the basic skills necessary for his job, especially where inferences are drawn in favor of the plaintiff.

With Boston having satisfied the first three prongs of the prima facie test, the analysis turns to the fourth—whether Boston's termination occurred under circumstances giving rise to an inference of discrimination.  Boston contends that the age difference between him and Respol is significant enough to give rise to an inference of discrimination, and that multiple discussions regarding Boston's retirement also contribute to the inference.  (*See* Pl. Opp. at 11.)  "Generally, a plaintiff's replacement by a significantly younger person is evidence of age discrimination." *Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 135 (2d Cir. 2000); *see also Terry v. Ashcroft*, 336 F.3d 128, 139 (2d Cir. 2003) (finding that "[a] fact-finder could also conclude that age discrimination was a factor in the decision because the person selected for the position was significantly younger than [plaintiff]" and the defendant indicated that the plaintiff was too old to be promoted).  The Second Circuit has held that an eight-year age difference is significant

enough to support an inference in the plaintiff's favor.  *D'Cunha*, 479 F.3d at 195.  Here, the age difference between Boston and Respol is eight years, since Boston was 71 and Respol was 63 at the time of Boston's termination, although Boston and Respol are considerably older than their counterparts in *D'Cunha*.  *See id.* (noting that D'Cunha was 49 and 50 the two times he interviewed for the position in question).

Macfadden contends that Boston cannot satisfy the fourth prong and that *D'Cunha* is distinguishable because (1) the age difference between Boston and his primary replacement, Respol, is insignificant,[7] (2) both Boston and Respol are well within the protected class, (3) the age difference between Boston and his other replacement, Sardone, is irrelevant because Sardone assumed less than 20% of Boston's duties, and (4) all the persons involved in the employment decisions were close in age to Boston.  (Def. Mem. at 19–21.)  Some of Macfadden's arguments have merit.  For example, because Sardone was not Boston's primary replacement and assumed only a small percentage of his responsibilities, consideration of his age is irrelevant.  *See Sullivan v. Brodsky*, No. 07-cv-0003 (BSJ), 2009 WL 2516838, at *7 (S.D.N.Y. Aug. 17, 2009) ("However, although Plaintiff argues that Mr. Taylor took over some of his responsibilities, Plaintiff has not provided a sufficient basis for concluding that Mr. Taylor was his 'replacement.'"), *aff'd*, No. 09-3879-cv, 2010 WL 2202977 (2d Cir. June 2, 2010).  Plaintiff

---

[7] Because Boston's position was eliminated, Respol is not his direct "replacement."  "[I]n the Second Circuit, the fact that a plaintiff was either not replaced by someone outside of his or her protected class, or not even replaced at all, 'may weaken, but certainly does not eliminate, the inference of discrimination.'"  *Jessamy v. City of New Rochelle, New York*, 292 F. Supp. 2d 498, 516 (S.D.N.Y. 2003) (quoting *Meiri v. Dacon*, 759 F.2d 989, 996 (2d Cir. 1985)).  In such cases, the plaintiff retains the "burden of proffering direct, circumstantial or statistical evidence that shows the existence of circumstances supporting an inference of unlawful discrimination."  *Id.* Among the types of evidence that courts have analyzed in these cases are the relative ages of those who assume the responsibilities of the eliminated position.  *See, e.g.*, *Montana v. First Federal Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 104–05 (2d Cir. 1989) (finding an inference of discrimination where a 56-year-old former employee's responsibilities were transferred to two 26-year-old employees).

appears to concede this point by referring to Boston's replacement as "eight years younger."  (Pl.

Opp. at 11.)  It is also possible that the eight-year gap of *D'Cunha* may not be dispositive, as it is

the fact that "a replacement is substantially younger than plaintiff" that provides the inference of

discrimination, not a hard line or a defined number of years.  *See O'Connor v. Consolidated*

*Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).  Defendant's argument about Boston and Respol

both being in the protected class, however, misses the mark.  As *O'Connor* makes clear, "[t]he

fact that one person in the protected class has lost out to another person in the protected class

is . . . irrelevant, so long as he has lost out *because of his age*."  517 U.S. at 312.

    As to defendant's arguments about the decision makers' age, the three cases the

defendant cites in support of his argument assume that the plaintiff has established a prima facie

case of discrimination and address the corresponding argument in the third step of the

*McDonnell Douglas* analysis.  *Mathews v. Huntington*, 499 F. Supp. 2d 258, 264 (E.D.N.Y.

2007) ("[T]he Court assumes that the plaintiff has made out the *prima facie* case required by

*McDonnell Douglas*."); *Brooks v. Leake & Watts Org., Inc.*, 02 Civ. 9865 (GEL), 2005 WL

1875772, at *4 (S.D.N.Y. Aug 2, 2005) ("[T]he Court assumes for purposes of deciding this

motion that Brooks has established a prima facie case of discrimination."); *Pisana v. Merrill*

*Lynch & Co.*, No. 93 Civ. 4541 (LMM), 1995 WL 438715, at *3 (S.D.N.Y. July 24, 1995).  This

Court will follow the same approach.  Given the minimal burden of an ADEA plaintiff to

advance a prima facie case, and Macfadden's anticipatory proffer of a legitimate, non-

discriminatory reason for the termination, the Court finds it expeditious to assume the existence

of the fourth element, and therefore the sufficiency of Boston's prima facie case.  The Court

therefore proceeds to Macfadden's proffered reasons for termination and the ultimate question of

whether a reasonable jury could find age discrimination from the evidence.

### C.  Macfadden's Legitimate, Nondiscriminatory Reasons

Defendant has articulated three reasons it claims are legitimate, nondiscriminatory reasons for terminating Boston's employment. Specifically, defendant claims that (1) necessary cost-cutting, (2) Boston's acts of insubordination, and (3) Boston's unsatisfactory performance with respect to his management style and interpersonal communications all justified Boston's termination.  (Def. Mem. at 21–22.)  An employer may permissibly terminate an employee for any of these reasons.  *See DeMarco v. CooperVision, Inc.*, 369 Fed. Appx. 254, 255–56 (2d Cir. 2010) (noting that cost-cutting is a legitimate, nondiscriminatory reason for termination); *Slattery*, 248 F.3d at 93 (dissatisfaction with performance is a legitimate, nondiscriminatory reason); *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir. 2000) (citing "outright insubordination" as a legitimate, nondiscriminatory reason); *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000) ("We have held generally that insubordination and conduct that disrupts the workplace are legitimate reasons for firing an employee.") (internal quotation marks omitted); *Memnon v. Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 352 (S.D.N.Y. 2009) (unsatisfactory performance is a legitimate, nondiscriminatory reason).

The defendant's burden of showing legitimate, nondiscriminatory reasons is "one of production, not persuasion; it can involve no credibility assessment."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000) (internal quotation marks omitted); *see D'Cunha*, 479 F.3d at 195–96.  Here, defendant has presented undisputed evidence that Macfadden could save more than half the cost of two production managers who could perform similar duties.  (Def. 56.1 Stmt. ¶ 56.)  Defendant has also presented undisputed evidence of incidents in which Boston disobeyed directives from Callahan, (*see* Def. 56.1 Stmt. ¶¶ 33, 45–48), and evidence that Boston had performance issues in his management style and interpersonal

communications.  (Def. 56.1 Stmt. ¶¶ 18, 20, 40, 41.)  Defendant, therefore, has met its burden

for the second step of the burden-shifting framework.

      *D.  Boston's Showing of Pretext*

      Because defendant has presented legitimate, nondiscriminatory reasons for its decision to

terminate Boston's employment, the burden shifts back to Boston to "raise[] sufficient evidence

upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age

was a 'but for' cause of [defendant's] decision to fire [him]."  *Gorzynski*, 596 F.3d at 107;

*Sullivan*, 2010 WL 2202977, at *1.

      Boston offers no evidence to contest defendant's contention that plaintiff's position was

eliminated primarily as a cost-cutting measure undertaken by Callahan.  Nor does Boston

factually dispute that Callahan actually considered Boston to be uncooperative, and, at times,

insubordinate.  Perforce, these reasons are not pretextual.

      Boston does proffer some evidence that his performance was not wholly unsatisfactory

because he received a modest salary raise and bonuses during the period from 2005 to 2008.  (Pl.

Opp. at 9.)  But Boston overstates defendant's position.  Callahan does not claim that Boston's

performance was wholly unsatisfactory; he claims only that he was dissatisfied with certain

aspects of his performance, particularly his management style.  (*See* Callahan Decl. ¶ 13.)  And

Callahan only identifies Boston's performance as a further consideration in the termination

decision after both cost-cutting and insubordinate conduct.  (*Id.* ¶¶ 13, 14.)  Furthermore, Boston

cites no case law in support of the proposition that salary raises and bonuses alone can create a

triable issue of fact, and indeed, the case law fails to support his argument.  Salary raises and

bonuses are of some probative value to show that an explanation of poor performance is

pretextual, but without more, fail to raise a genuine issue of material fact sufficient to avoid a

grant of summary judgment.  *See Saenger v. Montefiore Medical Center*, No. 07-cv-488 (KMK), 2010 WL 1529400, at *14 n.11 (S.D.N.Y. Mar. 31, 2010) ("[W]hile [*Chambers v. TRM Copy Centers Corp*, 43 F.3d 29 (2d Cir. 1994)] may suggest that Plaintiff's bonus is of some probative value, it does not hold that that fact alone creates a triable issue of pretext.").  In cases where a bonus or a salary raise contributed to a finding that the employer's proffered reasons were pretextual, the court made the finding in conjunction with some additional evidence of discriminatory animus.  *See Catalano v. Lynbrook Glass & Architectural Metals Corp.*, No. 06-CV-2907 (JFB)(AKT), 2008 WL 64693, at *11 (E.D.N.Y. Jan. 4, 2008) (denying summary judgment on discrimination claims where plaintiff's evidence included replacement by someone twenty-five years younger and a remark by a decision maker that plaintiff was "old and breaking down"); *see also White v. Arab Banking Corp.*, No. 93 Civ. 5355, 1996 WL 191727, at *13 (S.D.N.Y. Apr. 22, 1996) (denying summary judgment on gender discrimination claim using mixed-motive analysis where plaintiff had received positive evaluations and bonuses, but also adduced evidence of remarks suggesting a propensity toward gender discrimination).

 The only other evidence of age discrimination that Boston advances is talk of his retirement.  However, "even if plaintiff was asked about his retirement plans, inquiries about retirement plans do[ ] not necessarily show animosity towards age."  *Getler v. Cornell Weill University Medical College Dept. of Surgery*, No. 05 Civ 8550 (CLB), 2007 WL 38276, at *11 (S.D.N.Y. Jan. 3, 2007) (internal quotation marks omitted).  In cases where remarks are alleged to show age-related animus, "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."  *Tomassi*, 478 F.3d at 115.  Here, although plaintiff alleges that defendant "repeatedly inquired into [his] retirement plans . . . [, it] fails to raise an inference of age

discrimination" because "[t]he context of these comments . . . bel[ies] [plaintiff's] contention." *Spahr v. American Dental Centers*, No. 03 Civ. 4954 (DRH)(ARL), 2006 WL 681202, at *4 (E.D.N.Y. Mar. 14, 2006).  Defendant has adduced evidence that shows that Boston was the one to raise the topic of his retirement "from time to time," and that Schaeffer and Callahan became concerned about the prospect of being unprepared if Boston were to retire before Macfadden reorganized its operations.  (Schaeffer Decl. ¶ 23.)  Plaintiff has offered no evidence that controverts the defendant's evidence, nor has plaintiff adduced evidence of any context surrounding the discussions of retirement that would raise a reasonable inference that the discussions evinced age-related animus.  "Given the circumstances, with Plaintiff repeatedly raising the topic of retirement, . . . it is natural, and hardly creates an inference of discrimination, for [defendant] to inquire about [his] future plans."  *Spahr*, 2006 WL 681202, at *4.  The reasonable inference from the evidence is that Schaeffer and Cerza discussed Boston's retirement in direct response to Boston's initiation of the topic, not due to age-related animus.

Furthermore, while not dispositive, Callahan and Schaeffer, the decision makers, were well within the protected class at 66 years of age at the time of termination, weakening any inference of discrimination that could be drawn in this case.  *See, e.g.*, *Mathews*, 499 F. Supp. 2d at 267 (E.D.N.Y. 2007); *Connell v. Consolidated Edison Co. of New York*, 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2000).

Finally, plaintiff offers only conclusory statements asserting that defendant's stated reasons are a "smoke screen for the real reason he was terminated and that was his age."  (Pl. Opp. at 11.)  But "reliance upon conclusory statements or mere allegations is not sufficient to defeat a summary judgment motion."  *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002). Plaintiff, therefore, has not offered sufficient evidence to defeat defendant's summary judgment

motion, and no reasonable juror could find by a preponderance of the evidence that Boston's age was a but-for cause of his termination.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment [17] pursuant to Rule 56 is GRANTED, and plaintiff's action is hereby dismissed.  The Clerk of the Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
      September ___, 2010

Richard J. Holwell
United States District Judge